Filed 3/25/14  P. v. Aguirre CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESUS ARTURO AGUIRRE,<br><br>    Defendant and Appellant. | G046752<br><br>(Super. Ct. No. 10NF1086)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed February 24, 2014, be modified as follows:

On page 7, in the first sentence of the third full paragraph, replace the word "members" in the next sentence with the words "member Solorio" so the sentence reads:

In this case, Aguirre joined his fellow gang member Solorio in their confrontation with Magana outside Pixtun's apartment, carrying the loaded shotgun.

The modification does not change the judgment.  The petition for rehearing is DENIED.


                              THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


FYBEL, J.

Filed 2/24/14  P. v. Aguirre CA4/3 (unmodified versions

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046752 |
| v. | (Super. Ct. No. 10NF1086) |
| JESUS ARTURO AGUIRRE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

William J. Kopeny for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Lise Jacobson and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Jesus Arturo Aguirre guilty of attempted murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a); count 1; all further undesignated statutory references are to this code), assault with a deadly weapon (§ 245, subd. (a)(2); count 2), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3). As to count 1, the jury also found the attempted murder was willful, deliberate and premeditated (§ 664, subd. (a)), Aguirre vicariously discharged a firearm (§ 12022.53, subds. (c), (e)(1)), and Aguirre vicariously discharged a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)). Finally, as to both counts 1 and 2, the jury found the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).

The court sentenced Aguirre on count 1 to an indeterminate term of life with the possibility of parole (§ 664, subd. (a)), plus a consecutive term of 25 years to life (§ 12022.53, subds. (d), (e)(1)), and struck the remaining enhancements under section 12022.53, subdivisions (e)(2) and (f). The court also sentenced Aguirre to determinate terms on counts 2 and 3, but stayed those terms under section 654. Thus, Aguirre's total term of imprisonment is life with the possibility of parole, plus 25 years to life. Because he was 16 years old at the time he committed these crimes and the minimum period of confinement on the indeterminate life term is seven years (§ 3046, subd. (a)), Aguirre will be eligible for parole when he reaches age 49.

Aguirre challenges the sufficiency of the evidence to support the convictions. He also claims the prosecutor committed misconduct by arguing transferred intent, and the trial court committed error by failing to instruct on voluntary manslaughter. Finally, he argues the sentence imposed is cruel and unusual given his youth, his limited role in the crimes as an aider and abettor, and his relative lack of prior criminal record.

We affirm the convictions, reverse the sentence on ineffective assistance of counsel grounds, and remand the matter to the trial court for a new sentencing hearing.

2

**FACTS**

On March 13, 2010, between 15 and 20 members of the Eastside Buena Park criminal street gang gathered at the Walden Glen apartment complex in Buena Park. On the same day, Ramon Magana, a one-time member of the Anaheim Barrio Pobre criminal street gang with the sobriquet "Knuckles," was visiting his mother, Tami Pixtun, his sister, Margarita Mendoza, and several other family members at Pixtun's apartment in the Walden Glen complex.

Around 5:30 p.m., some of the Eastside Buena Park gang members called out for Mendoza to step outside the apartment.[1] She did not want to, so Magana and Mendoza's boyfriend went outside to investigate. Pixtun followed Magana outside, heard a gunshot, and heard Magana say, "Oh, shit." She saw him throw his hands back, try to run, and fall to the ground. The gunman fired at least one more shot at Magana, but Magana collected himself, yelled at his family to get inside, and ran back to Pixtun's apartment.

Buena Park Police Officer Andy Luong was quickly dispatched to the Walden Glen apartments. Luong arrived to a "very chaotic" scene with people yelling and screaming. He went to Pixtun's apartment and saw Magana lying on the floor, bleeding and screaming in pain. Magana "had several wounds near his upper torso," and it looked as though he had been shot by a shotgun loaded with birdshot.

Magana was taken to the hospital. A short time later Luong went there to talk to him. By that time, Magana had already been examined and treated for his wounds. Magana seemed reluctant to talk to Luong, and Luong described him as an "uncooperative" victim. Magana claimed he did not recognize his assailants, and he

---

[1] Magana, Mendoza, and to a certain extent, Pixtun, did not cooperate with the police investigation and were reluctant witnesses at trial. Some of these facts are based on their pretrial statements which were introduced at trial through other witnesses.

3

provided only a vague description. Although Magana's wounds were not life threatening, Luong testified birdshot fired from a shotgun can be lethal if fired in close proximity to the person.

Pixtun told Luong that Mendoza said either "Chico" or "Chuco" from Eastside Buena Park had been involved in the shooting. Aguirre is the only known "Chico" from Eastside Buena Park. Based on this information and their preliminary investigation, Buena Park police officers quickly arrested Aguirre.

Aguirre denied being at the Walden Glen apartment complex on the day of the shooting. However, he was put into a monitored cell at the juvenile detention facility with Julio Aparicio, a fellow Eastside Buena Park gang member. For over four hours, the two gang members talked about the shooting. Their conversation was recorded and edited down to about one hour, and this edited version was transcribed and played for the jury.

In the edited version of their conversation, Aguirre admitted he and Martin Solorio, another Eastside Buena Park member with the cognomen "Little Frosty," were at the Walden Glen apartments, and that Solorio shot Magana. Aguirre said he and Solorio thought Magana was a rival gang member who had "called [them] out." Aguirre said he argued with Solorio over who should shoot Magana, but he decided to give the loaded shotgun to Solorio.

Aguirre thought he recognized Magana, but by the time he handed the gun to Solorio, "it was too late." Aguirre also thought Solorio may have recognized Magana, but decided to shoot him anyway because "Big Frosty and [Magana] had pedo [problems] before . . . ." After claiming to want to move out of his neighborhood to avoid further hassles with the gang unit and gang lifestyle, Aguirre called Magana a "bitch" and said, "I should have smoked that fool . . . ."

Aguirre repeatedly told Aparicio the police had no evidence linking him to the shooting, and he intended to stick to his alibi. Aparicio pointed out that shooting

4

Magana would cause "some shit" because Magana's gang and Eastside Buena Park were allies. The prosecution's expert confirmed the two gangs were allies before the shooting and became rivals after it.

At trial, Pixtun testified she saw the shooter standing with another person, but both of them were wearing black hoodies and she could not see their faces, and only one of them had a gun. She did not identify Aguirre, and she denied telling Luong one of the individuals involved yelled, "Eastside Buena Park."

Mendoza testified she saw her brother walk out of the apartment, and she heard two shots just before her brother ran back to the apartment. She claimed to not remember telling the investigating officers anything about the shooting because it had "been two years." She denied telling Pixtun that Chico from Eastside Buena Park had done the shooting.

Magana testified he was standing outside his mother's apartment when he was shot, but he blacked out and did not remember anything about the incident. He claimed to have not seen the shooter, or remember talking to police officers at the hospital. Magana did not want to report the crime because he claimed to not know anything.

## DISCUSSION

*1. Sufficiency of the Evidence*

"The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

5

*a. Intent to Kill, Transferred Intent and Mistaken Identity*

Aguirre first challenges the sufficiency of the evidence to support the intent to kill element of his attempted murder conviction. We find the evidence sufficient. As the trial court correctly instructed the jury, "To prove that a defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing *another person*; [¶] AND [¶] 2. The defendant intended to kill *that person*." (CALCRIM No. 600, italics added.)

There is ample evidence in the record which is reasonable, credible, and of solid value, and from which a reasonable trier of fact could find Aguirre and Solorio both took direct but ineffective steps toward killing another person, and they both intended to kill that person. Solorio was the shooter, and Aguirre was the aider and abettor of the shooter. And there is no question the person actually shot was their intended target.

Attempting to avoid this inevitable conclusion, Aguirre argues, "The People tried this case on a 'transferred intent' theory, arguing to the jury that the shooting of the victim . . . was a case of 'mistaken identity' and that the intent was not to kill the victim, but that other person who was assumed to be a member of a rival gang."

The premise of this argument is faulty. The People did not try this case on a transferred intent theory. The People did try this case on a mistaken identity theory. During closing argument, the prosecutor mused, "Remember Barrio Pobre at the time of the shooting was actually a gang that got along with Eastside Buena Park. They were sort of friendly, sort of allies. I guess you could say this is a case of mistaken identity in a way." Similarly, the prosecutor said Eastside Buena Park gang members thought Magana was a rival gang member, but "they were mistaken."

Furthermore, Aguirre incorrectly equates this mistaken identity situation with a transferred intent situation. The mistaken identity situation here was not a case of transferred intent, because the person Solorio actually aimed at was the intended victim. This is to be contrasted with the bad aim situation where a defendant aims at one person

6

and hits another person by mistake, which does require an actual transfer of intent. Thus, it is irrelevant that Aguirre may have mistakenly thought the person aimed at was a rival gang member, but only realized his mistake after he handed the shotgun to Solorio.

### b. Aiding and Abetting

Aguirre also challenges the sufficiency of the evidence to prove his acts went beyond mere preparation, thus defeating the prosecution's aiding and abetting theory and precluding a conviction for attempted premeditated murder or assault with a deadly weapon. We disagree.

Of course, attempted murder requires "sufficient evidence of the intent to commit the murder plus a direct but ineffectual act toward its commission. [Citation.]" (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) However, the requisite intent may be established by circumstantial evidence (*People v. Boyd* (1987) 43 Cal.3d 333, 348), and may be inferred from the circumstances surrounding the attempt, including the actions of the defendant. (*People v. Chinchilla, supra,* 52 Cal.App.4th at p. 690.)

In this case, Aguirre joined his fellow gang members in their confrontation with Magana outside Pixtun's apartment, carrying the loaded shotgun. As he later told Aparicio, Aguirre originally intended to shoot Magana himself, but he handed the shotgun to Solorio instead. There was nothing ineffectual about these acts which went well beyond mere preparation. He was just lucky Magana did not die. Afterward, Aguirre took flight and denied being at the Walden Glen apartments that day. Thus, the evidence shows Aguirre acted with the requisite intent, and took direct but ineffectual acts to commit the attempted murder and the assault with a deadly weapon.

### 2. Prosecutorial Misconduct

Again referencing the prosecutor's mistaken identity comments to the jury, Aguirre claims the prosecutor impermissibly argued "the equivalent of an erroneous 'transferred intent' instruction" and gave "misadvice on the law" sufficient to constitute prosecutorial misconduct that required the trial court's intervention and a defense

7

objection.  Not so.  Nothing the prosecutor said in closing argument invoked the transferred intent doctrine.  There was no prosecutorial misconduct, trial court error, or ineffective assistance of counsel on this point.

*3. Instructional Error*

Next Aguirre contends the facts presented at trial and his theory of the case obligated the trial court to instruct sua sponte on the lesser included offense of attempted voluntary manslaughter.  Again, we disagree.

The trial court's duty to instruct on lesser included offenses is well established.  "'"That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.  [Citations.]"'"  (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155.)

"Voluntary manslaughter is a lesser included offense of murder when the requisite mental element of malice is negated by a sudden quarrel or heat of passion, or by an unreasonable but good faith belief in the necessity of self-defense.  'Only these circumstances negate malice when a defendant intends to kill.'  [Citation.]"  (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.)  Aguirre did not even argue he acted in self-defense, and there is no evidence of any provocation or heat of passion.

Likewise, we reject Aguirre's assertion his conviction for assault with a deadly weapon means "there is doubt whether the jury may have convicted on the lesser included offense of attempted voluntary manslaughter."  Aguirre does not explain this argument and it makes no sense to us.  Nevertheless, with all the evidence of the charged offenses and no evidence of the lesser included offense, the court did not have any duty to instruct on attempted voluntary manslaughter.

*4. Cruel and/or Unusual Punishment*

The federal Constitution prohibits imposition of punishment that is "cruel and unusual." (U.S. Const., 8th Amend.; see *Robinson v. State of California* (1962) 370 U.S. 660, 666–667.) Similarly, the state Constitution provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.) "Whereas the federal Constitution prohibits cruel 'and' unusual punishment, California affords greater protection to criminal defendants by prohibiting cruel 'or' unusual punishment." (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1092.)

Aguirre, who was just shy of his 17th birthday when he committed the instant crimes, claims the sentence imposed violates the California Constitution, relying primarily on *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*). Aguirre also claims the sentence imposed violates the federal Constitution, citing "recent case law" including *Miller v. Alabama* (2012) 567 U.S. __; [132 S.Ct. 2455] (*Miller*); *Graham v. Florida* (2010) 560 U.S. 48 __ [130 S.Ct. 2011, 2030] (*Graham*); and *Roper v. Simmons* (2005) 543 U.S. 551, 575 (*Roper*). Aguirre raised these constitutional claims for the first time on appeal, and we invited supplemental briefing on whether trial counsel's failure to raise them in the trial court constitutes prejudicial ineffective of counsel.

As we shall explain, since the sentence imposed is not the functional equivalent of life without the possibility of parole (LWOP), it does not constitute cruel and unusual punishment in violation of the federal Constitution under *Miller*, *Graham* and *Roper*. But it may constitute cruel and unusual punishment in violation of the California Constitution under *Dillon*. And defense counsel's failure to raise the point in the trial court constitutes ineffective assistance in connection with the sentencing.

*a. Federal Cruel and Unusual Claim*

"The issue of how long someone under the age of 18 may be sentenced to prison has been the subject of considerable judicial attention recently in the wake of *Miller*." (*People v. Perez* (2013) 214 Cal.App.4th 49, 55 (*Perez*).) "These cases follow a

9

remarkably consistent pattern. There is a bright line between LWOP's and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole. We are aware of — and have been cited to — no case which has used the *Roper–Graham–Miller–Caballero* [*People v. Caballero* (2012) 55 Cal.4th 262] line of jurisprudence to strike down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left at the time of eligibility for parole." (*Id.* at p. 57.)

"How much life expectancy must remain at the time of eligibility for parole of course remains a matter for future judicial development, but we can safely say that in the case before us there is plenty of time left for [Aguirre] to demonstrate, as the *Graham* court put it, 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' [Citation]." (*People v. Perez*, *supra*, 214 Cal.App.4th at pp. 57-58.) Here, much like in *Perez*, there is no dispute that Aguirre will be eligible for parole when he reaches age 49.[2] "That is, by no stretch of the imagination can this case be called a 'functional' or 'de facto' LWOP, and therefore neither *Miller*, *Graham*, nor *Caballero* apply. And, of course, *Roper* was a death penalty case and does not apply for that reason." (*Id.* at p. 58.) There simply is no federal 8th Amendment issue here.

### b. State Cruel and Unusual Claim

A lengthy juvenile sentence may be reduced under the older California Supreme Court jurisprudence of gross disproportionality, as shown in *Dillon*. The *Dillon* proportionality analysis is rigorous, multi-faceted and fact specific. (*Dillon, supra,* 34 Cal.3d at pp. 476-489.) On the record currently before us we cannot, and fortunately given our resolution of the related ineffective assistance claim discussed below need not, perform this analysis in the first instance. It is sufficient to note that while we recognize

---

[2] Because we conclude the sentence imposed is not the functional equivalent of LWOP, the alternative and earlier parole date determined under newly enacted section 3051 is irrelevant to our analysis of the federal cruel and unusual claim.

successful challenges based on *Dillon* are "extremely rare" (*Perez, supra,* 214 Cal.App.4th at p. 60), the present case might be among those which merit a lesser punishment under *Dillon* than that which was imposed. Moreover, "Since the determination of the applicability of *Dillon* in a particular case is fact specific, the issue must be raised in the trial court. Here, the matter was not raised below, and is therefore waived on appeal." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)

### c. Ineffective Assistance of Counsel Claim

"Under existing law, a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 350-351.)

"A defendant claiming ineffective assistance of counsel must satisfy *Strickland's* [*Strickland v. Washington* (1984) 466 U.S. 668] two-part test requiring a showing of counsel's deficient performance and prejudice. [Citation.] As to deficient performance, a defendant 'must show that counsel's representation fell below an objective standard of reasonableness' measured against 'prevailing professional norms.' [Citation.] 'Judicial scrutiny of counsel's performance must be highly deferential,' a court must evaluate counsel's performance 'from counsel's perspective at the time' without the 'the distorting effects of hindsight,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Jacobs* (2013) 220 Cal.App.4th 67, 75 (*Jacobs*).)

Even under these highly deferential standards, defense counsel's performance in connection with the sentencing was deficient. Defense counsel did not file a sentencing brief and did not even review the probation report with Aguirre. Defense counsel admitted he was ill prepared for the sentencing hearing, and he failed to properly request a continuance, although good cause for a continuance may have existed. Most importantly, defense counsel did not assert *Dillon* and the well-established

11

California Constitution protections against grossly disproportionate cruel and unusual juvenile punishments discussed above. In essence, defense counsel did nothing to advocate on behalf of Aguirre regarding the sentencing in this case.

Of course, Aguirre must also demonstrate prejudice as a result. "The prejudice prong requires a defendant to establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Jacobs, supra,* 220 Cal.App.4th at p. 75.) Aguirre has certainly been prejudiced by the waiver which resulted from defense counsel's failure to assert *Dillon* in the trial court. Therefore, our confidence in the outcome of the sentencing hearing is sufficiently undermined.

Under these circumstances it is appropriate for us to remand the case to the trial court for a new sentencing hearing. (§ 1260.)

### DISPOSITION

The convictions are affirmed, the sentence is reversed, and the matter remanded to the trial court for a new sentencing hearing. In light of this disposition the clerk of this court is directed to give the required notice to the State Bar and to trial counsel. (Bus. & Prof. Code, § 6086.7; Cal. Rules of Court, rule 10.1017.)


THOMPSON, J.

I CONCUR:


ARONSON, ACTING P. J.


12

FYBEL, J., concurring.

I agree with the majority opinion except that I also believe Jesus Arturo Aguirre—a juvenile convicted of a nonhomicide offense—should be resentenced with consideration given to the Eighth Amendment to the United States Constitution, which forbids the imposition of "cruel and unusual punishments."

Consideration of the Eight Amendment in this case, I conclude, flows logically and compellingly from the Supreme Court's opinion in *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*). The analysis and language of *Miller* support the application of an Eighth Amendment analysis whenever a juvenile faces a lengthy prison sentence for a nonhomicide offense.

The United States Supreme Court has long recognized, and still recognizes, the Eighth Amendment contains a "'narrow proportionality principle' that 'applies to noncapital sentences.'" (*Ewing v. California* (2003) 538 U.S. 11, 20, citing *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997 [conc. opn. of Kennedy, J., joined by O'Connor and Souter, JJ.] (*Harmelin*); see *In re Coley* (2012) 55 Cal.4th 524, 538.) In *Miller*, the United States Supreme Court extended this proportionality principle to juvenile offenders who face mandatory life without parole sentences for homicide offenses. The court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2460].) In reaching this holding, the court set forth principles governing the constitutionality of juvenile sentences under the Eighth Amendment.

The *Miller* court emphasized both that juvenile offenders are different from adult offenders and that the proportionality principle remains a core precept of Eight Amendment scrutiny of juvenile sentencing. The *Miller* court distinguished *Harmelin*, which had rejected an Eighth Amendment proportionality claim, on the ground "*Harmelin* had nothing to do with children and did not purport to apply its holding to the

1

sentencing of juvenile offenders." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2470].)  The *Miller* court analyzed its prior opinions in *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*) and *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) and concluded, "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing." (*Miller*, *supra*, at p. __ [132 S.Ct. at p. 2464].).  The court cited to "*Graham*'s admonition that '"[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed."'" (*Id.* at p. __ [132 S.Ct. at p. 2462].)  The court relied on *Roper* and *Weems v. United States* (1910) 217 U.S. 349, 367, for "'the basic "precept of justice that punishment for crime should be graduated and proportioned"'" to both the offender and the offense." (*Miller*, *supra*, at p. __ [132 S.Ct. at p. 2463].)  Indeed, "'[t]he concept of proportionality is central to the Eighth Amendment.'" (*Ibid.*)

After discussing *Graham*'s emphasis on "individualized sentencing," albeit in the context of the death penalty, the *Miller* court listed Supreme Court cases requiring that the "sentencer have the ability to consider the 'mitigating qualities of youth'" (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2467]), and stated that *Graham* "indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison" (*Miller*, *supra*, p. __ [132 S.Ct. at p. 2468]).  Again emphasizing that juvenile offenders are different, the Supreme Court stated, "[w]e have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children." (*Id.* at p. __ [132 S.Ct. at p. 2470].)  The court described its "mandate[]" as follows:  "[A] sentencer follow[s] a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Id.* at p. __ [132 S.Ct. at p. 2471].)

The critical point in *Miller* is its explanation how and why juvenile offenders differ from adult offenders.  The *Miller* court invested a significant amount of its analysis in so doing and, citing *Graham* and *Roper*, made three points:  (1) "juveniles

2

have diminished culpability and greater prospects for reform" and are "'less deserving of the most severe punishments'"; (2) "children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) "a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'" (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2464.) The *Miller* court noted its decision was based not only on "what 'any parent knows'" but on "'developments in psychology and brain science [that] continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.'" (*Ibid.*) These findings "of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his '"deficiencies will be reformed."'" (*Id.* at p. __ [132 S.Ct. at pp. 2464-2465].)

In a key paragraph, the *Miller* court concluded: "So *Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, *e.g.*, *Graham*, 560

3

U.S., at \_\_\_, 130 S.Ct. 2011 . . . ('[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings'); *J. D. B. v. North Carolina*, 564 U.S. \_\_, \_\_, 131 S.Ct. 2394 . . . (2011) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller*, *supra*, 567 U.S. at p. \_\_ [132 S.Ct. at p. 2468].)

I recognize *Miller* holds a mandatory sentence of life without the possibility of parole for juvenile offenders in a homicide case violates the Eighth Amendment's prohibition on cruel and unusual punishments (*Miller*, *supra*, 567 U.S. at p. \_\_ [132 S.Ct. at p. 2460]) and Aguirre was not sentenced to life without the possibility of parole or its functional equivalent (*People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*)). However, neither expressly nor by implication does *Miller* limit Eighth Amendment protections to juvenile offenders sentenced to life without the possibility of parole or its functional equivalent. Indeed, the differences between an adult mind and a juvenile mind—the driving force in the reasoning of *Miller*, *Graham*, and *Roper*—do not vanish when, as in this case, a juvenile offender is sentenced under a determinate sentencing system to a term of 25 years to life instead of life without the possibility of parole for a nonhomicide offense. A juvenile offender's neurological development does not automatically and suddenly advance to that of an adult with the imposition of a sentence other than life without the possibility of parole or its functional equivalent.

An opinion from this division has collected and reviewed decisions from the United States Supreme Court, California Supreme Court, and California Court of Appeal applying the *Roper*, *Graham*, *Miller*, and *Caballero* opinions, and found that cases finding an Eighth Amendment violation all concerned sentences of death, or life without the possibility of parole or its functional equivalent. (*People v. Perez* (2013) 214 Cal.App.4th 49, 55-57.) But no United States Supreme Court or California Supreme Court opinion, and none of the opinions listed in *People v. Perez*, holds Eighth

4

Amendment protections for juvenile offenders in nonhomicide cases are limited to those sentences. As *Miller*, *Roper*, and *Graham* all acknowledge, juvenile offenders are different from adult offenders, and the offender's status as a juvenile is a critical factor in Eighth Amendment analysis. The hallmarks of the immature juvenile mind—"transient rashness, proclivity for risk, and inability to assess consequences" (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465])—are no less present in a juvenile offender sentenced to 25 years to life for a nonhomicide offense as they are in a juvenile offender sentenced to life without the possibility of parole.

The principles discussed in *Miller* lead me to conclude the Eighth Amendment permits the imposition against a juvenile offender of a lengthy sentence for a nonhomicide offense (such as the one imposed on Aguirre) only after consideration of the juvenile's age and other individual factors, including whether he or she was a principal or an aider and abettor.

At what *time* must a court consider these factors? Again, the answer is found in *Miller*. In section III of the majority opinion, the Supreme Court continually focuses on "individualized consideration *before* sentencing." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at pp. 2469-2470], italics added.) Indeed, the *Miller* court described its own opinions in *Roper* and *Graham* as "mandat[ing] only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—*before* imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of *Roper*, *Graham*, and our individualized sentencing cases that youth matters for purposes of meting out the law's most serious punishments." (*Miller*, *supra*, at p. __ [132 S.Ct. at p. 2471], italics added.) It appears to me that a sentence of life with the possibility of parole, plus 25 years to life, qualifies as one of the "law's most serious punishments" (*ibid.*), especially when imposed on a juvenile for a nonhomicide crime he committed at the age of 16.

5

Thus, the principle that Aguirre, a juvenile, is entitled to individualized consideration *before* sentencing "flows straightforwardly from" *Miller* and the Supreme Court precedent described in *Miller*. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2471].)

Recently enacted Senate Bill No. 260 (2013-2014 Reg. Sess.), codified at Penal Code section 3051, provides that juvenile offenders may be eligible for release on parole at a youth offender parole hearing. Section 3051, subdivision (a)(1), states that "any prisoner who was under 18 years of age at the time of his or her controlling offense" shall be afforded a "youth offender parole hearing." Juvenile offenders with determinate sentences of any length shall receive a hearing during the 15th year of incarceration (Pen. Code, § 3051, subd. (b)(l)), juvenile offenders sentenced to life terms of less than 25 years to life shall receive a hearing during the 20th year of incarceration (*id.*, § 3051, subd. (b)(2)), and juvenile offenders sentenced to an indeterminate base term of 25 years to life shall receive a hearing during the 25th year of incarceration (*id.*, § 3051, subd. (b)(3).) The youth offender parole hearing "shall provide for a meaningful opportunity to obtain release." (*Id.*, § 3051, subd. (e).)

If Penal Code section 3051 applies to him, Aguirre would first be eligible for consideration in 25 years, when he will be approximately 42 years old. While section 3051 certainly is a significant step toward addressing the concerns expressed in *Miller*, it does not address the court's need to consider Aguirre's age and related factors before and at the time of sentencing. In this regard, I agree with the court in *In re Heard* (2014) 223 Cal.App.4th 115, 130, which concluded that section 3051 is a "'safety net'" only, and is not a "replacement for the sentencing court's execution of its constitutional duties as required under *Graham* . . . , *Miller* . . . and *Caballero* to consider the differences between juveniles and adults when sentencing a juvenile offender." I respectfully disagree, as did the court in *In re Heard*, with *People v. Martin* (2013) 222 Cal.App.4th 98 and *In re Alatriste* (Oct. 29, 2013, B248072) (nonpub. opn.), review

6

granted February 19, 2014, S214652, both of which reached the contrary conclusion that section 3051 affords juvenile offenders the type of evaluation compelled by *Miller*, *Graham*, and *Caballero* and gives them "'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*People v. Martin*, *supra*, at p. 105.)

The Attorney General, relying on Penal Code section 12022.53, subdivision (h), argues Aguirre's sentence was the only one authorized because "the court did not have the authority to strike the firearm use enhancement." This argument is based on the sentence provided under section 12022.53; it does not address whether the statutory sentence passes constitutional muster as applied. For the reasons I have explained, it may not, depending on the required individualized analysis of the proper sentence of a juvenile offender in a nonhomicide offense.

Under the cited authority, before a sentence is imposed, the sentencing court should give Aguirre's sentence individualized consideration by applying the factors set forth in *Miller*. Accordingly, I would reverse the sentence and remand for resentencing under both the California Constitution and the United States Constitution. It is premature to conclude whether Aguirre's sentence should be reduced, precisely because no individualized analysis of his sentence has yet been conducted.

FYBEL, J.